IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | | |
|---|---|---|---|
| TIMOTHY CALL, | ) | | |
| | ) | | |
| Plaintiff, | ) | Civil Action No. 5:12cv00008 | |
| | ) | | |
| v. | ) | | |
| | ) | | |
| NATHAN HARRISON, JR., <u>et al.</u>, | ) | By: | Michael F. Urbanski |
| | ) | | United States District Judge |
| Defendants. | ) | | |
| | ) | | |

## MEMORANDUM OPINION

This matter is before the court on defendants Nathan Harrison, Jr. and Williamson Distributors, Inc.'s Motion to Dismiss and for Sanctions (Dkt. # 50) and Motion for Summary Judgment (Dkt. # 64). These motions, among others, were argued on October 18, 2012. By oral Order entered the same date, the court took the Motion to Dismiss and for Sanctions under advisement and granted the Motion for Summary Judgment except as to certain allegations contained in paragraph 27 of Count I of plaintiff's Complaint, which were also taken under advisement. The court gave the parties an opportunity to file supplemental briefs on the outstanding issues. These motions are now ripe for adjudication.

In this case, plaintiff Timothy Call seeks damages for personal injuries allegedly sustained when the car he was driving ran over a drive shaft that had fallen off of the truck driven by Harrison, on behalf of Williamson, some seven minutes earlier. Having carefully considered the issues, the court finds that given the timing and circumstances of the accident, no reasonable jury could conclude that Harrison was negligent in failing to warn Call of the drive shaft that had just fallen off of his truck. As such, summary judgment will be entered in favor of defendants. Further, Call's failure to identify the full extent of his prior medical condition and

treatment history when called upon to do so under oath, in and of itself, requires dismissal of this action. Accordingly, this matter will be dismissed with prejudice.

**I.**

In an oral Order entered October 18, 2012, the court granted defendants' Motion for Summary Judgment in part, finding there was no evidence of negligence on the part of the defendants in causing a u-joint to fail and the drive shaft to fall off of the truck. Call offered the expert testimony of Robert Reed, whose report indicates has many years of experience in the trucking industry concerning safety and maintenance, in support of a claim that the Williamson truck was not maintained properly. Reed did not examine the Williamson truck, broken u-joint or drive shaft in question, and based his opinion entirely on the lack of maintenance records kept by defendant Williamson. From his examination of Williamson's records, along with public information obtained from the Federal Motor Carrier Safety Administration, Reed draws the following conclusion: "The public records on Williamson Distributors Inc. reflect that as a motor carrier the inspection records generated by their drivers and commercial vehicles were abnormal and beyond the limits of a reasonably safe motor carrier in vehicle maintenance and fatigued driving (hours of service) for the time period of this incident with Mr. Call on February 16, 2010." Def. Summ. J. Br., Dkt # 66, Ex. E, at 5. Based entirely on his records review, Reed reaches four opinions regarding the truck he never saw and the u-joint and drive shaft he never examined: (1) that Williamson "did not perform maintenance of tractor #212 to manufacturer and industry standards"; (2) "did not act in a reasonable manner in maintaining a maintenance files [sic] on its commercial motor vehicle #212"; (3) "[t]he driveshaft of truck-tractor #212 should not have fallen off in use on the highway"; and (4) "Williamson Distributors Inc. and Nathan Harrison's actions were causal factors of the incident of February 16, 2010." Id.

2

As indicated in open court on October 18, Reed's conclusion is not admissible as an expert opinion under the standards set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999). In performing a gatekeeper function, the trial court must ensure that the proposed expert testimony meets a standard of evidentiary reliability. Factors to consider in determining whether proposed expert testimony meets such a standard include whether a theory or technique can be and has been tested, whether it is subject to peer review, whether there are standards applicable to the technique and whether the theory or technique enjoys general acceptance within the relevant scientific community.

Reed's proposed testimony meets none of these criteria. Reed finds that Williamson does not keep proper maintenance records on its fleet of trucks, and from there leaps to the speculative conclusion that improper maintenance "was a causal factor of the incident of February 16, 2010." Def. Summ. J. Br., Dkt. # 66, Ex. E, at 5. This assertion is not grounded in an examination of the truck, u-joint or drive shaft, and it cannot be tested based upon any generally accepted methodology or engineering basis. In essence, all Reed knew was that a u-joint failed, causing a drive shaft to fall on the highway from a truck as to which there were scant maintenance records. From these facts alone, Reed concludes that it was most likely that the u-joint failed and the drive shaft fell off of the truck due to insufficient lubrication. Although there could be many reasons why the u-joint failed, Reed testified in his deposition that "it was more probable a maintenance issue because of the lack of records." Def. Summ. J. Br., Dkt. # 66, Ex. F, at 138. The conclusion that Williamson did not properly perform preventative maintenance on the u-joint and drive shaft is utter conjecture wrapped in the cloak of an expert opinion. As such, it

3

cannot meet the threshold requirement of evidentiary reliability imposed by Daubert and Kumho Tire.

The element of causation likewise poses an insurmountable hurdle to plaintiff's claim that this accident resulted from negligent maintenance by Williamson. Even if one could jump to the conclusion Reed reaches that a lack of maintenance records means the Williamson truck fleet was not properly maintained in general and the u-joint and drive shaft of the truck in question were not adequately lubricated in particular, there is simply no evidence that a lack of lubrication caused the drive shaft to fall off the truck. Indeed, there is no evidence in the record of any reason, beyond conjecture, as to why the u-joint failed causing the drive shaft to dislodge.

It is well established under Virginia law that negligence cannot be presumed from the mere happening of an accident.

> The burden is on a plaintiff to produce evidence of preponderating weight from which the trier of fact can find that the defendant was guilty of negligence which was a proximate cause of the event resulting in damage. The evidence must prove more than a probability of negligence. A plaintiff must show why and how the incident happened. And if the cause of the event is left to conjecture, guess, or random judgment, the plaintiff cannot recover.

West Point v. Evans, 224 Va. 625, 627-28, 299 S.E.2d 349, 351 (1983) (citing Sneed v. Sneed, 219 Va. 15, 17, 244 S.E.2d 754, 755 (1978)).

Further, the evidence "'must show more than that the accident resulted from one of two causes, for one of which the defendant responsible and for the other of which []he is not.'" Farren v. Gilbert, 224 Va. 407, 411, 297 S.E.2d 668, 670 (1982) (quoting Sneed, 219 Va. at 18, 244 S.E.2d at 755). Reed was unwilling to eliminate operator error as the cause of the u-joint failure. He testified:

4

> Q. But you're not going to express an opinion today or at court that anything he did or didn't do in operating that truck in terms of the driving of it caused that drive or U-joint to fail, are you?
>
> A. Well, no. I have to leave that open.
>
> Q. Okay.
>
> A. You're asking me to come up with an only cause. I can't come up with an only cause. I can't come up with an only cause or causal factor.

Def. Summ. J. Br., Dkt. # 66, Ex. F, at 91-92. Likewise, Reed testified: "it was more probable a maintenance issue because of the lack of records, but I also stated driver error, misuse of clutch." Id. at 138.

At the end of the day, Reed's conclusion that the failure to lubricate the u-joint and drive shaft caused it to fail is nothing more than an untested hypothesis. As such, it is far too unreliable to be admitted as an expert opinion.[1] The court, following Daubert and Kumho Tire, exercised its discretion as gatekeeper and ordered that this speculative and untested opinion not be presented to the jury.

## II.

Without any credible evidence to support the contention that Williamson or Harrison was negligent in causing the u-joint to fail and the drive shaft to fall off the truck, plaintiff's case devolves into the allegation that Harrison was negligent in failing to warn Call of the hazard

---

[1] As the court noted at the October 18, 2012 hearing, there are additional problems with Reed's ability to function as an expert witness in this case. At his deposition, Reed improperly refused to answer certain questions posed by counsel for defendants. At one point during the deposition, counsel for the defendants pressed Reed on whether he knew it was the front or rear drive shaft that fell off of the truck. At some point during the examination, Reed refused to answer further, contending that as a matter of "trial tactics" he could decline to answer until the defendant driver was deposed. Reed took the position that if he answered the questions, defense counsel could use his answers to "coach" Harrison. Def. Summ. J. Br., Dkt. # 66, Ex. F, at 126-28, 146-49. As an expert witness, Reed has no ability to decline to answer deposition questions simply because his answers may educate the defense. There is no applicable privilege, and his refusal to answer questions at deposition is improper. Counsel for plaintiff was given an opportunity to remedy the situation but expressly declined to do so. Def. Summ. J. Br., Dkt. # 66, Ex. F, at 127.

posed by the drive shaft in the few short minutes that elapsed between the truck's mechanical failure and Call's vehicle running over the drive shaft. This allegation is contained in paragraph 27 of Count I of the Complaint. Following subsequent briefing on the issue, the court concludes that there is no genuine issue of material fact to be decided by a jury. As no reasonable jury could find Harrison's conduct under the circumstances to be negligent, summary judgment must be entered for the defendants and the case dismissed. See Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994) (a genuine issue of triable fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986))).

**A.**

Call first claims that Harrison was negligent by not putting on his flashers and displaying a warning triangle after his truck lost power. It is undisputed that the truck was in the left lane when it began to lose power. It is likewise undisputed that Harrison was able to maneuver the truck into the right lane and off the right side of the road before stopping. There is a disputed issue of fact as to whether Harrison put on his flashers and put out his warning triangle. While Call claims that Harrison did not put on his emergency flashers or a warning triangle, both Harrison and an eyewitness, Alyssa Claycomb, testified that the truck's flashers were on. Def. Summ. J. Br., Dkt. # 66, Ex. A, at 53-54; Ex. C, at 13-15. That issue of fact is not material, however, because Call testified in his deposition that he "saw a bevy of vehicles off to the right side with their flashers on. [He] followed Virginia State Law, got in the left lane, reduced speed and hit the drive shaft." Def. Summ. J. Br., Dkt. # 66, Ex. D, at 61. The Harrison truck was located further down the road from the "bevy of vehicles" with their flashers on that Call saw. Thus, whether Harrison had turned on his flashers and put out his warning triangle is immaterial,

6

as Call plainly was on notice that something was going on from the "bevy" of vehicles also off to the right side of the road with their flashers on.

**B.**

Call's remaining claim is that Harrison should have warned him of the drive shaft on the highway before Call's vehicle ran over it. By all accounts, the time between when the Harrison truck lost power and when Call's vehicle and the drive shaft made contact was very brief. Claycomb stated in her deposition that traffic (her car and Harrison's truck included) had been stopped at a stop light. Def. Summ. J. Br., Dkt. # 66, Ex. C, at 7-14. Claycomb testified that Harrison's truck was still moving from the left lane to the right lane when her car ran over the drive shaft. Id. at 14. Claycomb described her contact with the drive shaft "like a speed bump, like a rough speed bump." Id. at 16. Claycomb described the timing of her encounter with the drive shaft as follows:

> Q. Okay. How much time had elapsed from the time that you first saw the tractor trailer activate its hazard lights and move into the right lane and then onto the shoulder, and the time that you stopped your vehicle?
>
> A. Like how much time in between it?
>
> Q. Yes. Like once everybody came to a stop and you got out of your vehicle.
>
> A. I mean, he did it right away. He did what he was supposed to do. I couldn't tell you exact timing, but he did right what he was supposed to. Like if anybody dropped anything off my car or something like that, say if I had a truck, something flew off the truck, you pull over. He did the right thing by doing that. And then, I mean, the cops were right there. There was a cop on the opposite side, so he got there quick and asked us what was going on, and went up to that guy and had the tractor trailer guy stay up there.

7

Id. at 15-16. Claycomb added that she did not think that any other vehicles hit the drive shaft after her vehicle:

> Q. Do you know whether any other vehicles hit the drive shaft after yours?
>
> A. No.
>
> Q. They did not?
>
> A. I don't think so, no. Because I was the last one. And when I ran over the first one and the second one, I hit my brakes right away. And then the guy, the person that was in the black car, there was a guy that was with that lady, and he got out and was trying to drag it, because it was real heavy, he was trying to drag it over. And then when the cop got there they moved it to the cop car.
>
> Q. Was that right after you had hit it?
>
> A. Yeah.

Id. at 16.

In his deposition, Harrison estimated that less than seven minutes elapsed between the time he stopped his vehicle and the time he was able to inspect the underside of his truck and noticed the drive shaft was missing. Harrison testified:

> Q. Okay. And how long can you estimate it was that you noticed that the drive shaft was missing from the time you stopped – were able to stop the truck and get out of the truck, until you – and did your inspection?
>
> A. No more than – less than seven minutes, maybe, sir. With everything going on – lanes, lane open, four-way, clear traffic to get over. I'll say a seven minute interval.

Def. Summ. J. Br., Dkt. # 66, Ex. A, at 55. During that period, Harrison testified that he put on his flashers, secured his vehicle, put out his warning triangle and notified his dispatch office of his predicament. Id. at 51-58. After he did this, Harrison "looked to see what was going on with

8

[his] vehicle. And [he] couldn't see, flashlight and everything." Id. at 53. Harrison testified as follows:

> Q. Thank you. I think that answers my question. Who actually went and got the – driveshaft from out of the roadway?
>
> A. I can't recall that, sir.
>
> Q. Was it you?
>
> A. I was checking to see what had happened, walking back like I stated. I had a deputy notify that something – "Is that your truck, driver?" I said, "Yes, sir." He say, "Well, we got something in the road, and it - got something in the – in the road." His – his – his statement was, "I have been notified that some vehicles had hit something driver. Is that your truck?" I said, "Yes, sir, it is." And we proceeded from there and he said, "Well, I need your license. And I need your license, and I'll be right back."

Id. at 58.

Under these factual circumstances, no reasonable jury could find that Harrison negligently failed to warn Call of the drive shaft on the highway. See Shaw, 13 F.3d at 798. Although Harrison was aware there was something wrong with his truck causing it to lose power and requiring him to pull over, there is no evidence that he was aware he had lost a drive shaft and that it was sitting in the roadway, until he was advised by the deputy. By that time, Call's vehicle had struck the drive shaft and the deputy had removed it from the roadway. Given witness Alicia Claycomb's description of how quickly the cars impacted the drive shaft, there is no possibility that any reasonable jury could attribute any fault to Harrison.

At the hearing on October 18, the court asked the parties to research and file supplemental briefs on the issue of the failure to warn claim against Harrison. In his ensuing brief, Call argues that the common law imposes a duty on a driver to exercise reasonable care so as not to obstruct a highway, and that Virginia Code § 18.2-324 requires a person dropping destructive, hazardous or injurious material on the road to remove it immediately. Defendants,

9

on the other hand, argue that Call's failure to warn claim must be dismissed, as there is no evidence that Harrison knew the drive shaft was on the highway before Call's vehicle ran over it.

Both the facts and the law compel the court to agree with defendants' position. As previously stated, there is no evidence that Harrison was aware that the drive shaft had fallen off of his truck before he was approached by the deputy and was told something had fallen off of his truck. Def. Summ. J. Br., Dkt. # 66, Ex. A, at 57-58. Additionally, eyewitness Alicia Claycomb testified that she ran over the drive shaft even before Harrison's truck stopped moving and that she was the last vehicle to do so. Def. Summ. J. Br., Dkt. # 66, Ex. C, at 14-16.

"Actionable negligence requires proof of a legal duty to exercise ordinary care for the safety of another person or his property, a breach of that duty, and an injury proximately resulting from that breach." Culberson v. McCloud, 227 Va. 249, 252, 315 S.E.2d 219, 220 (1984) (citing Jordan v. Jordan, 220 Va. 160, 162, 257 S.E.2d 761, 762 (1979)). In Culberson, the Virginia Supreme Court approved the use of a sudden emergency instruction in an automobile accident case involving brake failure. As here, "[p]roof of the sudden mechanical failure was uncontroverted, [the driver] was unaware of the defect in the brakes, and there was no evidence that [the driver] was guilty of any act or omission which brought about the emergency with which he was confronted." Id. at 253, 315 S.E.2d at 221. Likewise, in this case, there is no dispute that the drive shaft fell off of the Williamson truck suddenly and without warning. Nor is there any evidence that Harrison knew of a problem with the drive shaft or did anything to cause it to dislodge from the truck. "It is well settled that where the driver of an automobile, without prior negligence on his part, is confronted with a sudden emergency, and acts as an ordinary prudent person would have done under the same or similar circumstances, he is not guilty of negligence." Southern Passenger Motor Lines v. Burks, 187 Va. 53, 60, 46

10

S.E.2d 26, 30 (1948) (citing McGowan v. Tayman, 144 Va. 358, 368 (1926); Otey v. Blessing, 170 Va. 542, 552, 197 S.E. 409, 413 (1938); Bloxom v. McCoy, 178 Va. 343, 348, 17 S.E.2d 401, 403 (1941)). The circumstances of this case simply afford no suggestion of a breach of this standard. There is no evidence that Harrison was aware the drive shaft had fallen off his truck before Call ran over it. As such, no reasonable jury could find that he negligently failed to warn Call or otherwise acted unreasonably.[2] Summary judgment is therefore appropriate.

### III.

Even had the facts of this case created a jury issue, it must be dismissed for an additional reason. It is clear to the court that during the discovery process, plaintiff Call did not disclose the full extent of his prior medical condition. Call's failure to disclose so tainted the discovery process that the court has no choice but to dismiss this case.

### A.

Call claims that he injured his neck and left shoulder when his car ran over the drive shaft. When asked about pre-existing medical conditions in written interrogatories, Call's sworn response identified only GERD.[3] Def. Sanctions Br., Dkt. # 51, Ex. A, at ¶ 9. When asked to identify medical practitioners providing any treatment in the ten years prior to the accident, Call identified four: Julie Landrio, M.D., Internal Medicine Consultants (indicating that she was his

---

[2] There are no applicable statutes suggesting a contrary conclusion. Call cites a criminal statute, Virginia Code § 18.2-324, but it has no application here. As the Virginia Supreme Court noted in Kimberlin v. PM Transport, Inc., 264 Va. 261, 270-71, 563 S.E.2d 665, 670 (2002), that statute cannot provide a presumption of negligence in a civil case where, as here, there is no evidence that Harrison acted intentionally in dropping the drive shaft on the highway. Nor can any liability be predicated upon Virginia Code § 46.2-888, which generally prohibits stopping on a highway in such a manner as to impede or render dangerous its use. As the Kimberlin court noted "the statute, by its express terms, does not apply 'in case of an emergency, an accident, or a mechanical breakdown.'" 264 Va. at 270, 563 S.E.2d at 670.

[3] GERD is gastroesophageal reflux disease, which is a chronic condition caused by stomach acid coming up from the stomach into the esophagus. It bears no relation to the musculoskeletal injuries Call claims he suffered in this accident.

11

primary care physician); Catherine S. Smith, M.D., Shenandoah Head & Neck Specialists, PLC (indicating that she treated him for GERD); James E. Gardiner, M.D., Winchester Gastroenterology Associates (indicating he performed a colonoscopy); and Richard Taliaferro, his dentist. Def. Sanctions Br., Dkt. # 51, Ex. A, at ¶ 13.

Call was deposed on June 14, 2012. At that deposition, defense counsel asked Call a more inclusive question about the physicians he had seen "for any reason whatsoever at any time from 1989 till [sic] today here in Winchester or anywhere else." Def. Sanctions Br., Dkt. # 51, Ex. B, at 54. Call replied, "I can't recall all their names, but I think I listed those in my interrogatories." Id. Restating Call's answer to the interrogatory referenced above, defense counsel asked:

> Q. I have Dr. Landrio, Catherine Smith and Shenandoah Head and Neck Specialist, James Gardner [sic] at Winchester Gastroenterology Associates, and Richard Tolliver [sic], your dentist. Is that right?
>
> A. Yes.
>
> Q. Can you think of any other physicians or medical professionals you had seen at any time between 1989 and February of 2010 for any reason other than those four that we have listed here in answer to interrogatory number 13?
>
> A. I think there was a dermatologist and I cannot remember her name.

Id. at 54-55.

Three months later, a different picture of Call's prior medical history began to emerge. During the deposition of Call's primary care physician, Dr. Landrio, on September 4, 2012, Call's counsel attempted to cross-examine Dr. Landrio with medical records from a practice group, Internal Medicine Specialists, that Call had not identified. Not only had Call not identified this practice group in his discovery responses, the medical records Call's counsel

12

sought to introduce at the deposition had not been produced in discovery.[4]  Def. Sanctions Br., Dkt. # 51, Ex. E, at 56-59.

These medical records, produced for the first time at Dr. Landrio's deposition, were a revelation to the defendants.  These records identified treatment of Call by numerous other doctors, including rheumatologist Gregory Kujala, M.D., for chronic bone and joint pain prior to the accident in this case.  Defendants subpoenaed medical records from eleven previously undisclosed treating providers as a result of the disclosure of these records at Dr. Landrio's deposition.  Responses to these subpoenas revealed an additional eight undisclosed providers.  None of these providers were identified by Call in his deposition.  Records from these providers documented Call's extensive treatment history for joint and bone pain.  As noted previously, Call did not disclose this condition in his sworn interrogatory answers or any supplemental answers.  Nor did he disclose this condition in his deposition testimony.   Defense counsel asked:

> Q.  Prior to February, 2010, did you have any medical conditions, diagnosed medical conditions for which you have been receiving treatment or testing or any kind of consultations from any healthcare provider?
>
> A.  It seems there was something with Dr. Landrio.  I believe she classified it as Fibromyalgia and with a change in habits and a better exercise program and that went away.
>
> Q.  And that was sometime before February 2010?
>
> A.  It was in the early 90s.
>
> Q.  Early 90s.  Any other medical conditions that you had been treated for or diagnosed with at any time prior to 2010?
>
> A.  Not that I recall.

---

[4] These previously unproduced medical records from Dr. Landrio included records from within the last ten years, which defendants explicitly had requested in their Request for Production of Documents.  See Def. Sanctions Br., Dkt. # 51, Ex. D, at ¶ 3.

Def. Sanctions Br., Dkt. # 51, Ex. B, at 57-58. In contrast to his deposition testimony, Call's medical records paint a rather different picture, that of long-term, ongoing complaints of joint and bone pain.

In a similar vein, Call was questioned exhaustively at his deposition about whether he had ever had any left shoulder pain in the past:

> Q. Okay. Had you ever had any left shoulder pain before the accident that occurred on February 16th, 2010?
>
> A. No.
>
> Q. Had you ever injured your left shoulder in any way before February 16th, 2010?
>
> A. Not that I can recall.
>
> Q. Did you complain to any medical professional about left shoulder pain at any time before the February 16th, 2010 accident?
>
> A. Not that I recall.
>
> Q. Had you ever experienced left shoulder weakness, tingling, pinching, anything like that at any time before the February 16th, 2010 accident?
>
> A. Not that I recall.
>
> Q. Is there anything that would affect your ability to remember whether or not you had left shoulder problems before this accident in February, 2010?
>
> A. Not that I'm aware of.

Def. Sanctions Br., Dkt. # 51, Ex. B, at 90-91. Medical records obtained by subpoena after the Dr. Landrio deposition indicate the contrary:

- "He has had a left-sided injury in the past and this may be musculoskeletal pain," Def. Sanctions Br., Dkt. # 51, Ex. I;

14

- "[F]or six months now a history of myalgias with some morning stiffness, generalized muscle tenderness and pain, most prominent today on the left side," Def. Sanctions Br., Dkt. # 51, Ex. Q;

- "Intense episodic" shoulder pain which Call described "like a pry bar in there," Def. Sanctions Br., Dkt. # 51, Ex. R;

- Call complained of "stiffness in his lower back and some mild back pain and a headache," Def. Sanctions Br., Dkt. # 51, Ex. S, following a February 20, 2001 rear end car collision;

- "Slipped and wrenched shoulder" while using sledge hammer to repair mailbox, Def. Sanctions Br., Dkt. # 51, Ex. T.

It is difficult to reconcile Call's deposition testimony with the length and breadth of his medical history reflected in his medical records.

Even if the previously referenced inconsistencies could be chalked up to a failed recollection, Call's discovery failures prove inexcusable given the significant impact his health condition has had on his career. In the 1990s, Call worked as an air traffic controller with the Federal Aviation Administration ("FAA"). When questioned about any work-related injuries Call had experienced from 1980 to 2012 that required him to seek medical treatment, Call testified only that:

> I had a muscle spasm in my neck or upper shoulder from leaning over a radar scope somewhere in the 90s and the muscle just locked up and I had to seek treatment for that, but I have never had any other issues as far as that.

15

Def. Sanctions Br., Dkt. # 51, Ex. B, at 33. Call testified that he only treated with Dr. Landrio one time for this condition, and that "[s]he possibly wrote [him] a scrip," but noted that the fact he could not remember "would mean that [he] didn't even fill it." Id. at 34-35.

Contrary to this testimony, Call in fact was disqualified as an air traffic controller due to his medical condition and the medications he took for that condition. Dr. Kujala's office notes from October 18, 1996 paint a rather different picture of the impact Call's medical condition had on his work:

> 10/18/96 Mr. Call called to ask we disqualify him for current position as Air Traffic Controller in order to get another job in the agency. He said: 1) His pain causes distraction & forgetfulness. 2) That he cannot sit in front of radar screen for long periods. 3) That he does not appear to be getting better. I agree.

Def. Sanctions Br., Dkt. # 51, Ex. V. In a letter to the FAA's Regional Flight Surgeon dated October 22, 1996, Dr. Kujala repeated these references to Call's continuing symptoms from his notes. His letter continued as follows:

> I agree with these statements and have demonstrated his continuing to have tender points on exam. He still complains of being extremely stiff and that simple activities such as stretching his legs cause pain. He still has pain in multiple areas of his body and is waking up 3 to 4 times a night despite fairly aggressive medications . . . each evening.
>
> On September 26th when I last saw him . . . I felt that his sleep was still disordered and he still had Fibromyalgia based on his exam which demonstrated multiple tender sites with a normal joint exam and normal strength. It is my opinion that he is unlikely to improve in the near future and there is no guarantee that he will ever improve completely. I have been concerned throughout the time that I have known him that his symptoms have been distracting him and decreasing his ability to perform his duties which are understandably quite stressful where attentiveness is critical.

Def. Sanctions Br., Dkt. # 51, Ex. W.

16

Call failed to disclose Dr. Kujala and more than a dozen other treating physicians in deposition testimony. Even if there was a plausible explanation for that failure, it is inconceivable that Call simply forgot about a medical condition that was significant enough to cause him to seek a medical disqualification from his position as an air traffic controller. Given these facts, the court reaches the inescapable conclusion that Call failed to disclose the full extent of his prior medical condition and treatment in discovery in this case.

### B.

"[W]hen a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process, the court has the inherent power to dismiss the action." United States v. Shaffer Equip. Co., 11 F.3d 450, 462 (4th Cir. 1993). The rule in Shaffer was applied in a similar context in Sprester v. Jones Motor Co., No. 5:05cv00021, 2006 U.S. Dist. LEXIS 16427 (W.D. Va. Apr. 4, 2006). In Sprester, plaintiff claimed injuries to her back resulting from a motor vehicle accident. Similar to Call's testimony in this case, Sprester testified in deposition that she had not received any medical attention for her back for the nine years preceding the accident. Following her deposition, however, defense counsel obtained medical records detailing Sprester's years of treatment for her previous back injury. Finding that Sprester's misrepresentations as to her medical history tainted the deposition testimony of medical experts and profoundly stymied defendant's ability to prepare for trial, the court found that Sprester committed a fraud on the court and dismissed the action. See also Holmes v. Wal-Mart, No. 1:10cv75, 2011 U.S. Dist. LEXIS 46020 (E.D. Va. Apr. 27, 2011) (plaintiff's claim for compensatory damages stricken where plaintiff provided false testimony concerning her medical condition).

17

While a federal court's inherent power to sanction includes the power to dismiss a case in its entirety, the Fourth Circuit has emphasized that courts must exercise this authority with restraint. See Shaffer, 11 F.3d at 462. Thus, in the Fourth Circuit, before a court can dismiss a case for "fraud on the court" or abuse of the litigation process, the following six factors must be considered: (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and (6) the public interest. Id. at 462-63.

Application of these factors to this case compels the conclusion that dismissal is not only warranted, but necessary. First, Call's failure to disclose his prior medical condition is plain. Second, Call cannot blame this failure on his counsel as it stems from his own deposition testimony. Third, Call was asked under oath to detail his prior medical providers and medical condition. He did not do so. Our system of justice cannot work unless that oath is enforced and parties are held accountable when it is violated. Fourth, until the end of the discovery period, defendants operated under the assumption that Call had no prior shoulder or musculoskeletal issues. Only after the depositions of Call, his spouse, Dr. Landrio and Dr. Schuler were taken did defendants become aware of the full extent of Call's prior problems. Defendants' expert, Dr. O'Brien, likewise was not aware of Call's prior medical history. Given the fact that the true nature of Call's medical condition was not revealed until the end of the discovery period, the depositions that were taken would have to be repeated at great time and expense. Fifth, given the peculiar circumstances of this case, the court cannot fashion a remedy short of dismissal that is

18

appropriate.  In short, Call cannot expect to ask this court to enter a judgment awarding him damages for personal injuries after failing to reveal the nature and extent of his relevant prior medical history.  The public interest is not served by allowing this case to go forward under these circumstances.

## IV.

In sum, the court concludes that this case must be dismissed with prejudice.  Plaintiff has no evidence to suggest that the failure of the u-joint and dislodging of the drive shaft were due to any negligence on the part of defendants, nor could any reasonable jury conclude that Harrison knew the drive shaft had fallen off his truck and was on the highway before Call's car ran over it.  Finally, Call's failure to disclose the full extent of his prior medical condition under oath also warrants dismissal.   A separate Order will be entered to that effect.

Entered:  November 30, 2012

*/s/ Michael F. Urbanski*

Michael F. Urbanski
United States District Judge